**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

ORIGINAL

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   NOV 21 2007   ★

BROOKLYN OFFICE

CV 07   4857

BLOCK, J.

BOYLE. M.J.

| | |
|---|---|
| Gyrodyne Company of America, Inc., | No. |
| Plaintiff, | |
| -against- | |
| Full Value Partners L.P., Bulldog Investors General Partnership, Phillip Goldstein, Andrew Dakos and Timothy Brog, | |
| Defendants. | |

## COMPLAINT

Plaintiff Gyrodyne Company of America, Inc. ("Gyrodyne" or the "Company"), by and through its undersigned attorneys, for its complaint against Defendants Full Value Partners, L.P. ("Full Value"), Bulldog Investors General Partnership ("Bulldog"), Phillip Goldstein ("Goldstein"), Andrew Dakos ("Dakos") and Timothy Brog ("Brog") (collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1.      Plaintiff seeks preliminary and permanent injunctive relief to prevent Defendants from using a materially false and misleading proxy statement (the "Bulldog 2007 Proxy") and a false and misleading letter to Gyrodyne's shareholders to solicit the proxies of Gyrodyne's unsuspecting shareholders: (i) to place three representatives of Bulldog onto Gyrodyne's Board of Directors; and (ii) to dismantle the shareholder rights plan that protects Gyrodyne's shareholders against inadequate and coercive takeover proposals.  Defendants Bulldog and Goldstein have a long history of flagrantly violating and disregarding federal and

state securities laws and abusing the proxy process for their own gain.  Although not disclosed in their proxy, Bulldog routinely acquires stakes in companies and engages in proxy contests to enrich itself and pursue its own agenda at the expense of other shareholders.

2.    The Bulldog 2007 Proxy is Defendants' _second_ attempt to mislead Gyrodyne's shareholders into voting for their self-serving proposals by means of a materially false and misleading proxy statement.  Indeed, on or about November 14, 2006, Defendants mailed a nearly identical proxy statement to Gyrodyne's shareholders (the "Bulldog 2006 Proxy") without pre-clearing it with the Securities and Exchange Commission ("SEC") as required by Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and the rules promulgated by the SEC thereunder.  Like the proxy disseminated by Defendants this year, the Bulldog 2006 Proxy proposed: (i) the election of Defendants Goldstein, Dakos and Brog to Gyrodyne's Board of Directors and (ii) the dismantling of Gyrodyne's shareholder rights plan.  Moreover, Defendants knew when they mailed the Bulldog 2006 Proxy that their proposals were untimely under the Company's by-laws and could not be presented at Gyrodyne's annual meeting; however, Defendants failed to disclose to Gyrodyne's shareholders that granting their proxy to Defendants would effectively deprive them of their vote.

3.    When the SEC learned that the Defendants had mailed their proxy to shareholders without first receiving clearance from the staff of the SEC's Division of Corporate Finance (the "SEC Staff") as required under the federal securities laws, the SEC Staff issued a comment letter to Defendants and instructed them to revise the proxy statement to, among other things, affirmatively disclose to shareholders that Messrs. Goldstein, Dakos and Brog had violated the federal securities laws and that the proposals contained in the proxy failed to comply with the advance notice requirements contained in Gyrodyne's by-laws and would be ruled out-of-order if presented at the annual meeting.  Defendants simply ignored the SEC Staff's

instructions.  When Gyrodyne held its annual shareholders' meeting on December 7, 2006, Bulldog's proxy was ruled out of order and the proxies Defendants had obtained were not counted.

4.     This year, Defendants are once again seeking to solicit proxies with a nearly identical -- and equally misleading – proxy statement.  On October 10, 2007, the Defendants filed a preliminary proxy statement (the "Bulldog Preliminary Proxy") with the SEC which was substantially identical to, and just as deficient as, the Bulldog 2006 Proxy.  Upon information and belief, the SEC Staff provided comments to Defendants and almost certainly advised Defendants that like the Bulldog 2006 Proxy, their Preliminary Proxy contained misstatements and omissions of material fact and instructed Defendants to revise their proxy and resubmit it to the SEC Staff before mailing it to Gyrodyne's shareholders.  Upon information and belief, Defendants once again ignored the SEC Staff's instructions.

5.     Indeed, on November 9 2007, Defendants filed a definitive proxy statement (the "Bulldog 2007 Proxy"), which failed to address the numerous material omissions, misstatements and deficiencies contained in their Preliminary Proxy.  On or about November 12, 2007, Bulldog began to distribute the Bulldog 2007 Proxy.  On or around November 16, 2007, Defendants filed with the SEC and distributed to Gyrodyne's shareholders a false, misleading and disparaging letter urging Gyrodyne's shareholders to vote in favor of the proposals set forth in the Bulldog 2007 Proxy (the "Bulldog Letter").  The Bulldog 2007 Proxy plainly violates Section 14(a) of the Exchange Act, Rules 14a-3 and 14a-9 promulgated thereunder, and openly flouts the authority of the SEC.  The Bulldog Letter also violates Section 14(a) and Rule 14a-9.

6.     The Bulldog 2007 proxy omits, among other things, any disclosure that defendants Goldstein, Dakos and Brog willfully violated the federal securities law in soliciting Gyrodyne shareholders last year (and again this year); that, indeed Defendants Goldstein, Dakos

-3-

and Bulldog have a history of flouting SEC Rules and federal and state laws put in place to protect shareholders; that Defendants Goldstein, Dakos and Bulldog are motivated solely by their own interests and greed and have on numerous occasions taken stakes in other companies or sought representation on company boards in order to enrich themselves at the expense of the targeted company and its other shareholders.

7.     Likewise, Defendants also fail to disclose Bulldog's violation of state securities laws.  For example, the Bulldog 2007 Proxy omits any mention of the fact that defendants Goldstein, Dakos, Full Value and Bulldog have been found to have illegally solicited investors to purchase unregistered investments in Bulldog's Funds in violation of Massachusetts laws.  Indeed, on October 17, 2007, the Massachusetts Securities Division ruled that Bulldog, Full Value, Goldstein and Dakos had violated Massachusetts securities laws by offering unregistered securities for sale in that state and illegally soliciting investors through Bulldog's website.

8.     Defendants' inadequate proxy similarly omits any disclosure of Bulldog's history of corporate raiding and "greenmail".  In this regard, Bulldog routinely launches expensive proxy contests to force target companies to sell assets, buy back shares or buyout Bulldog's stake at a premium.  According to their own marketing materials, Bulldog, Goldstein and Dakos proudly describe themselves as "activists" that "unlock value" by engaging in proxy contests (over two dozen in the past eight years) and forcing the liquidation of companies.  The short-term value they "unlock," however, inures to their benefit, leaving the companies they target poorer, more heavily leveraged and without critical cash or assets.  Bulldog and its investors benefit when they sell their short-term investment; the target and its remaining shareholders are left to suffer the long-term consequences.

9.     The omitted information is plainly material to shareholders who have a

-4-

right to know that Bulldog, Goldstein and Dakos will enrich themselves at their expense and without regard to applicable laws, rules or regulations. If Defendants are permitted to solicit proxies, absent disclosure of these facts, Gyrodyne's shareholders will be forced to cast their vote in the dark as to Defendants' background, their character and integrity, and their true motives, operating under the mistaken belief that Defendants seek to benefit all Gyrodyne shareholders, when history makes clear that Defendants only seek to enrich themselves.

10.     The false and misleading Bulldog Letter, moreover, is riddled with misrepresentations and false and unsupported accusations of mismanagement and waste. It falsely impugns the character, integrity and skill of Gyrodyne's management and Board of Directors in an improper effort to sway shareholders to vote their shares for Bulldog. Defendants cannot be permitted to mislead shareholders into voting for Bulldog's nominees.

11.     Unless the Court enjoins Defendants from soliciting proxies pursuant to their incomplete, false and misleading proxy statement and false and disparaging letter, Gyrodyne and its shareholders will be irreparably harmed and Defendants will effectively deprive Gyrodyne shareholders of their right to cast an informed vote. The Court should therefore enjoin Defendants from soliciting or voting any proxies unless and until they correct <u>all</u> of the material misrepresentations and omissions and issue a proxy statement that complies with the federal securities laws.

## JURISDICTION AND VENUE

12.     The claims arise under section 14(a) of the Exchange Act. This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

13.     Venue is proper in this district pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) because the false and misleading information for which Plaintiff seeks relief was

transmitted into this district and was intended to be read and relied upon by securities holders within this district.

14.     Acts and transactions constituting and in furtherance of the violations of the law have occurred, are occurring, and unless enjoined, will continue to occur, in this district. The actions cited have been carried out by the means and instrumentalities of interstate commerce and by use of the United States mail.

## PARTIES AND RELATED ENTITIES

15.     Plaintiff Gyrodyne is a New York corporation with its principal place of business in St. James, New York.

16.     Upon information and belief, Defendant Bulldog Investors General Partnership is a partnership organized under the laws of New York that manages and advises investment funds. Bulldog describes itself an "activist" investor, whose tactics include amassing a significant percentage of a target company and then "putting pressure on management" to take actions that may cause the market price of the share to rise temporarily, by publicly campaigning for, among other things, "liquidation, a share buyback, a self-tender."

17.     Upon information and belief, Defendant Full Value Partners L.P. is a limited partnership organized under the laws of Delaware, with its principal place of business in New Jersey. Full Value is one of the "investment vehicles" marketed by Bulldog. Bulldog describes Full Value as a "fund that concentrates on taking substantial positions in undervalued operating companies and closed-end mutual funds" and that "acts as a catalyst to 'unlock' these values through proprietary means."

18.     Upon information and belief, Defendant Phillip Goldstein is a resident of New York and a co-founder and principal of Bulldog and a managing member of Full Value

-6-

Advisors LLC, the general partner of Full Value.   As described in this Complaint, Goldstein has a prolific history of disregarding the laws, rules and regulations that govern the United States capital markets.

19.     Upon information and belief, Defendant Andrew Dakos is a resident of New Jersey and a principal of Bulldog and a managing member of Full Value Advisors LLC, the general partner of Full Value. Dakos has been working with Goldstein since at least 1999, when he became a principal of Bulldog.  Dakos has been involved with many of the self-serving schemes devised by Bulldog and Goldstein.

20.     Upon information and belief, Defendant Timothy Brog is a resident of New York and a principal of Locksmith Capital Management.   He has been nominated by Bulldog as part of a slate of directors in at least one other proxy contest.

## FACTS COMMON TO ALL COUNTS

21.     Section 14(a) of the Exchange Act authorizes the SEC to promulgate rules to protect shareholders from abuses in the solicitation of proxies.  The SEC, in turn, has created a regulatory framework designed to ensure that those seeking the authority to vote shareholders' proxies provide shareholders with all material information necessary to make an informed decision about the character, integrity and intentions of the persons seeking their proxy.

22.     To that end, the securities laws and the rules promulgated by the SEC require that any person who solicits authority from shareholders to vote their shares make mandatory disclosure of specified information in a proxy statement.  In this regard, Rule 14a-3 requires that the proxy statement must make clear who is making the solicitation, provide pertinent background information including any history of unlawful conduct or involvement with other companies, as well as disclose the purpose of the solicitation and the specific matters or

directors for whom the person seeking the proxy intends to vote and why. Specifically, Rule 14a-3 requires that proxy statements contain the information specified in Schedule 14A. Item 7 of Schedule 14A details the information required to be included if a proxy solicitation involves action to be taken with respect to the election of directors; with regard to a director nominee, Item 7 requires the disclosure of, among other things, the nominee's involvement in any proceedings adverse to the registrant, the nominee's transactions involving the registrant and the nominee's independence. Furthermore, the securities laws and rules promulgated by the SEC prohibit fraudulent or misleading proxy solicitations.

23.     Pursuant to Rule 14a-6, preliminary proxy materials must be submitted to the SEC for review at least 10 days before being sent to shareholders. In a situation involving contested matters, the SEC Staff reviews the preliminary proxy materials to determine whether they comply with the law and provide the requisite information. Where, as here, the proxy materials do not conform to the law or omit material information, the SEC Staff provides comment letters to the submitting party requesting appropriate revisions. Pursuant to Rule 14a-6, definitive copies of proxy materials (containing the revisions requested by the SEC Staff) must also be filed with the SEC before being mailed to shareholders. These pre-clearance safeguards are intended to protect shareholders from being disenfranchised by granting their voting authority to another person based on incomplete or misleading information.

### Defendants' Track Record

24.     Defendants Goldstein, Dakos and Bulldog have a track record of flouting these shareholder protections to conceal their sordid history of corporate raiding and greenmailing. Here, too, Defendants simply omit any disclosure of their past violations of the securities laws, their disregard of other shareholders' interests and Bulldog's track record of plundering companies and taking greenmail payoffs precisely because Defendants know that

-8-

shareholders would not likely give Defendants their proxies if their history and true motives were fully disclosed.

25.    Indeed, the Bulldog 2007 Proxy fails to disclose that on or about November 14, 2006, Bulldog mailed a nearly identical proxy statement to Gyrodyne shareholders without receiving the requisite clearance from the SEC.  A true and correct copy of the Bulldog 2006 proxy is attached hereto as Exhibit 1.

26.    Like the Bulldog 2007 Proxy Statement, the Bulldog 2006 Proxy Statement: (i) nominated Goldstein, Dakos and Timothy Brog as directors and (ii) proposed to abolish Gyrodyne's Shareholder Rights Plan.  Like the Bulldog 2007 Proxy Statement, the Bulldog 2006 Proxy Statement was materially misleading and failed to include even the most basic information required by the federal securities laws.

27.    On November 29, 2006, after learning that Defendants had mailed the Bulldog 2006 Proxy to Gyrodyne's shareholders, the SEC issued a comment letter to Bulldog. Among other things, the SEC letter informed Defendants that:

> Because a preliminary proxy statement was not first filed [with the SEC as required by Rule 14a-6], the participants in the solicitation [Defendants] violated Rule 14a-6 of Regulation 14A.  Please revise the proxy statement to affirmatively indicate the participants have committed a *federal securities law violation.*

(emphasis added).  The SEC further instructed Bulldog to disclose that, because it had been notified by Gyrodyne that its proxy failed to comply with the advance notice requirements contained in Gyrodyne's by-laws, any proxies delivered to Defendants were at risk of not being counted and their proposals were untimely and would be ruled out of order by Gyrodyne.  The SEC also instructed Defendants to revise their proxy to identify all of their affiliates and other persons who were participating in the solicitation, as well as their holdings, if any, of Gyrodyne stock.  Indeed, the SEC Staff's letter stated that, in the opinion of the SEC Staff, "[t]he proxy

statement . . . has been disseminated with material omissions." A true and correct copy of the SEC's November 29, 2006 letter is attached hereto as Exhibit 2.

28.     In response to the SEC's comment letter, Defendant Dakos sent a letter to the SEC, dated December 4, 2006 (the "Bulldog Response Letter"), refusing to make any of the revisions required by the SEC to bring the proxy in compliance with its rules. In that letter, Dakos complained that "[s]ome of the proxy rules and procedures are almost certainly unconstitutional," that "[t]oo many staff comments deal with minutiae," that "there is no benefit to be gained through additional responses to staff comments" and stated that Bulldog "did not intend to make any additional filings." A true and correct copy of the Bulldog Response Letter is attached hereto as Exhibit 3.

29.     The Bulldog 2007 Proxy fails to disclose Defendants' violation of and previous refusal to comply with applicable SEC Rules or the federal securities laws in connection with the Bulldog 2006 Proxy, despite the SEC Staff's direction to make such disclosures in the Bulldog 2006 Proxy.

30.     What is more, the Bulldog 2007 Proxy nowhere discloses that Defendants proceeded with their 2006 proxy solicitation knowing that their proxy was untimely under Gyrodyne's by-laws, effectively disenfranchising those Gyrodyne shareholders that granted Defendants their proxies. In this regard, even though Defendants were notified at least three times by the Company prior to their solicitation and voting that their proxies would be ruled out of order under the Company's by-laws, Defendants solicited proxies from the Company's shareholders and presented a ballot at the Company's 2006 annual meeting, purportedly voting in favor of Messrs. Goldstein, Dakos and Brog and Bulldog's proposal to abolish the Company's shareholder rights plan. Consistent with the Company's numerous warnings to Bulldog, Bulldog's proposals were ruled untimely under the Company's by-laws and the votes Defendants

had obtained were not counted. As such, those shareholders who had given Defendants their proxies were disenfranchised and effectively deprived of the opportunity to cast their votes.

### Defendants' Previous History of Self-Interested and Unlawful Conduct

31.     Likewise, the Bulldog 2007 Proxy omits any disclosure (as required by the federal proxy rules) of Goldstein's, Dakos' and Bulldog's sordid history of placing their own interests ahead of the interests of the companies they target and those companies' other shareholders and abusing the proxy machinery to enrich themselves at the expense of the targeted companies' and their shareholders' long-term interests.

32.     In its marketing materials given to investors to raise capital for its Funds, Bulldog describes itself as an "activist" investor that specializes in investing in publicly traded companies. Bulldog's marketing materials explain that its technique is to amass a significant percentage of a target company and then begin "putting pressure on management" to take actions that may cause the market price of the shares to rise in the short-term, such as publicly campaigning for "liquidation, a share buyback, a self-tender". Then, when the price of the targeted company's shares increases, albeit for the short-term, Bulldog sells its investment at a profit, and leaves the remaining shareholders with less value than they had before. In all cases, Bulldog, Goldstein and Dakos act in their own interest and contrary to the interest of other shareholders. Bulldog, Goldstein and Dakos have a track-record that demonstrates that they will not only disregard the interests of other shareholders to achieve profits for themselves, but that they will also disregard laws, rules or regulations that might stand in their way. Bulldog's investment strategies are not disclosed in the Bulldog 2007 Proxy because Defendants know that shareholders would not likely give Defendants their proxy if their strategy of targeting companies for their personal profit were disclosed.

33.     Among the facts omitted from the Bulldog 2007 Proxy is Defendants'

-11-

history of violating federal and state laws, as well as the rules and regulations that govern public companies. In addition to their flagrant violation of federal proxy rules in connection with the Bulldog 2007 Proxy and the Bulldog 2006 Proxy, the Bulldog 2007 Proxy nowhere discloses that in January 2007, the Massachusetts Securities Division brought enforcement proceedings against Goldstein, Dakos, Full Value and Bulldog for offering securities for sale that were not properly registered under the Massachusetts securities laws and to stop them from illegally soliciting investors. In July 2007, a Massachusetts Securities Division hearing officer found that they had committed a violation of Massachusetts securities law and recommended a cease-and-desist order and up to a $25,000 fine. In October 2007, that recommendation was fully adopted by the Massachusetts Securities Division.

34. Defendants also fail to disclose that, on more than one occasion, Bulldog, Goldstein and Dakos have taken actions with respect to their targeted companies that are directly contrary to the interests of other shareholders. For example, despite repeated warnings, Bulldog permitted its investment in Bancroft Fund Ltd. ("Bancroft"), a closed-end investment company registered under the Investment Company Act to imperil Bancroft's status as a registered investment company. In this regard, Section 12(d)(1)(A) of the Investment Company Act limits the amount of voting shares any investment company, such as Bulldog, can own in a company registered under the Investment Company Act to no more than three percent of the entity's shares. Disregarding the laws and rules enacted by Congress and the SEC, Bulldog acquired and continues to hold more than three percent of Bancroft's outstanding shares. In so doing, Bulldog has imperiled Bancroft's status as a registered investment company and has refused to reduce its holdings despite the harm this could cause Bancroft and its public shareholders and despite repeated requests from Bancroft to do so. Indeed, Bancroft has been forced to sue Defendants Bulldog, Goldstein and Dakos to force them to comply with the investment limitations imposed

by the Investment Company Act.

35. Similarly, Defendants omit any disclosure of Bulldog's actions with respect to Mexico Equity and Income Fund ("Mexico Equity"), which have caused it to violate the listing requirements of the New York Stock Exchange and risk the delisting from the New York Stock Exchange of Mexico Equity's securities. In this regard, after obtaining control of Mexico Equity through a proxy contest, Goldstein placed himself, Dakos and another representative of Bulldog on the audit committee of Mexico Equity's board. Pursuant to New York Stock Exchange Listed Company Manual § 303A.07, Mexico Equity must have at least one financial expert on the audit committee. Neither Goldstein nor his other representatives is a financial expert as defined in the Stock Exchange Rules. The violation of the listing requirements, if not corrected, could lead to the New York Stock Exchange delisting Mexico Equity's stock. Accordingly, by forcing their way onto the audit committee, Bulldog placed Mexico Equity in violation of the New York Stock Exchange listing requirements, risking the delisting of its shares and depriving shareholders of the protection (instituted in the wake of the Enron and WorldComm scandals) of having at least one financial expert on audit committee.

36. Defendants also fail to disclose Bulldog's history of greenmailing companies. Recently, Bulldog and its ally Karpus Investment Management ("Karpus") acquired a 3 percent stake in the Seligman Quality Municipal Fund ("Seligman") and then disclosed its intention to gain control of Seligman and terminate the investment management agreement between Seligman and its manager, under the guise of benefiting investors. In their proxy statement, Bulldog described Seligman's performance as "abysmal" and claimed to be "appalled by the lack of oversight by [Seligman's] Board of Directors." Bulldog's purely self-interested intentions were revealed, however, when only three months later, it entered into an agreement to sell its shares to an affiliate at Seligman at a considerable premium to the then current market

price of those shares that was not available to public shareholders of Seligman. In exchange, Bulldog agreed not to acquire shares in the fund, participate in any litigation or regulatory proceeding against Seligman, participate in any solicitation of proxies relating to Seligman, or act to control or influence Seligman or its management for a period of 25 years.

37.    The Bulldog 2007 Proxy also conceals Bulldog's disenfranchisement of the shareholders of RMR Hospitality and Real Estate Fund ("RMR"). In connection with RMR's 2007 annual meeting, Defendants sent a proxy statement to RMR's shareholders setting forth proposals to nominate its slate of directors (Defendants Goldstein and Dakos) and terminate RMR's advisory agreement with its advisors. In that proxy, Bulldog, Goldstein and Dakos claimed to be concerned with the best interests of the shareholders. When an informal count of shareholder votes before the meeting demonstrated that Bulldog would be defeated, however, Goldstein chose not to appear at the meeting and did not present Bulldog's nominations or proposals, or the very votes of its shareholders, thus impermissibly disenfranchising those shareholders that gave him their proxy.

38.    Defendants also fail to disclose that Goldstein purchased shares of RMR for his personal account and then followed up with large purchases by a hedge fund he controls. Goldstein's personal purchase of shares prior to the purchase of shares by the fund controlled by him constitutes "front running" in violation of the federal securities laws.

39.    The Bulldog 2007 Proxy also conceals the fact that RMR had to sue Bulldog for violating a maximum ownership rule in its Trust Agreement following numerous requests by RMR over prolonged period of time for Bulldog to bring its holdings into compliance. These violations by Bulldog burdened RMR (and its unsuspecting shareholders) with considerable fees and expenses.

**Defendants' Deficient 2007 Proxy**

40.      Gyrodyne's 2007 annual stockholder meeting is scheduled to be held on December 5, 2007 at 11:00 a.m., Eastern Time, at Flowerfield Celebrations, Mills Pond Road, Saint James, New York.

41.      On October 10, 2007, 2007, Full Value filed the Preliminary Proxy on Schedule 14A with the SEC.   The Bulldog Preliminary Proxy is substantially identical to the Bulldog 2006 Proxy, including essentially all of the material omissions and violations of the federal proxy rules identified by the SEC Staff in its November 29, 2006 letter to Defendants. Upon information and belief, the SEC Staff provided comments to Defendants and almost certainly advised Defendants that like the Bulldog 2006 Proxy, the Bulldog Preliminary Proxy is replete with misstatements and omissions of material fact, and once again instructed Defendants to revise their proxy and resubmit it for clearance before mailing it to Gyrodyne's shareholders. Defendants, upon information and belief, however, simply ignored the SEC Staff's instructions. A true and correct copy of the Bulldog Preliminary Proxy is attached hereto as Exhibit 4.

42.      Indeed, on November 9, 2007, Full Value filed the definitive Bulldog 2007 Proxy Statement with the SEC.   The Bulldog 2007 Proxy fails to correct any of the material misstatements or omissions in the Preliminary Proxy and once again flagrantly violates Rule 14a-6.   On or about November 12, 2007, Bulldog began to distribute the Bulldog 2007 Proxy, without the requisite clearance from the SEC and in violation of the federal securities laws.  A true and correct copy of the Bulldog 2007 Proxy is attached hereto as Exhibit 5.

43.      On or around November 16, 2007, the Bulldog Defendants filed with the SEC and distributed to Gyrodyne's shareholders the Bulldog Letter, a false and disparaging letter urging shareholders to vote in favor of the proposals set forth in Bulldog's 2007 Proxy.  A true and correct copy of the Bulldog Letter is attached hereto as Exhibit 6.

44.     As explained in more detail in paragraphs 45 through 54, the Bulldog 2007 Proxy Statement violates Section 14(a) of the Exchange Act.   The Bulldog 2007 Proxy presents a prime example of the type of solicitation that Section 14(a) was designed to prevent. The Bulldog 2007 Proxy is so devoid of information and so riddled with misstatements and mischaracterizations that it is misleading to shareholders and risks causing irreparable harm to both Gyrodyne and its shareholders.

45.     The Bulldog 2007 Proxy is only three pages and is strikingly similar to the Bulldog 2006 Proxy, which the SEC Staff stated <u>violated</u> the federal securities laws and directed Defendants to disclose the violation.   Like the Bulldog 2006 Proxy, the Bulldog 2007 Proxy is materially misleading, flouts the law and disregards SEC requirements.   Indeed, the Bulldog 2007 Proxy ignores the precise comments provided by the SEC in connection with the nearly identical Bulldog 2006 Proxy.   The Bulldog 2007 Proxy Statement fails to fully disclose all information necessary for the Company's shareholders to be able to evaluate the character and integrity of Bulldog, its nominees and its proposals and is replete with material misstatements and omissions in violation of Section 14(a) and Rules 14a-3, 14a-4 and 14a-9 promulgated thereunder.

46.     The Bulldog 2007 Proxy fails to disclose Bulldog's history of greenmailing and corporate raiding, as well as their past violations of the federal and state laws enacted to protect investors and their total disregard of the rules, regulations and requirements governing their investments in numerous other companies.   Defendants fail to disclose Goldstein's, Dakos' and Bulldog's past conduct because they know that if they did, Gyrodyne's shareholders would likely realize that Defendants are self-interested corporate raiders and reject their proxy out of hand.

47.     Specifically, Defendants' Bulldog 2007 Proxy is materially misleading

and violates Section 14(a) of the Exchange Act and Rules 14a-3, 14a-4 and 14a-9 by failing to disclose the following information, which is material to an evaluation of the integrity of Bulldog, Full Value and its nominees and is required by Item 7 of Schedule 14A:

(a)     That the Division of Corporation Finance of the SEC, in a letter from Nicholas P. Panos, Special Counsel, Securities and Exchange Commission dated November 29, 2006, stated that Bulldog and its nominees violated Rule 14a-6 of the Securities Exchange Act of 1934 in connection with the Bulldog 2006 Proxy and directed Bulldog to disclose in its proxy statement that it had committed a federal securities law violation.   Bulldog refused to make this disclosure in the Bulldog 2006 Proxy and has continued to omit any such disclosure from the Bulldog 2007 Proxy;

(b)     That on October 17, 2007, the Acting Director of the Massachusetts Securities Division issued a <u>Final Order</u> finding that Full Value Partners L.P., Bulldog Investors General Partnership and nominees Phillip Goldstein and Andrew Dakos violated § 301 of the Massachusetts Uniform Securities Act (the "Act"), which makes it unlawful for any person to offer securities for sale in the Commonwealth of Massachusetts unless the securities are registered, the transaction is exempt or the security is a federally-covered security. The Acting Director ordered a permanent cease-and-desist from committing any further violations of the Act and a $25,000 administrative fine, the maximum penalty allowed under Massachusetts law for this violation;

(c)     That Goldstein purchased shares of RMR for his personal account and then followed up with large purchases by a hedge fund he controls. Goldstein's personal purchase of shares prior to the purchase of shares by the

-17-

fund controlled by him constitutes illegal "front running;"

(d)    That RMR had to sue Bulldog for violating the maximum ownership rules in its Trust Agreement following numerous requests by RMR over prolonged period of time for Bulldog to bring its holdings into compliance. These violations by Bulldog burdened RMR with considerable fees and expenses;

(e)    That Goldstein and Bulldog solicited proxies from other shareholders of RMR, but chose not to appear at the shareholder meeting and did not present the proxies when it appeared that he would not have enough votes to elect his nominees and pass his proposals, thus disenfranchising those shareholders and ignoring the votes that he solicited;

(f)    That Bancroft was recently forced to sue Bulldog, Goldstein and Dakos for violating the maximum ownership rules set forth in the Investment Company Act;

(g)    That Bulldog and Goldstein obtained control of Mexico Equity and placed their representatives on the Fund's audit committee, leaving the audit committee without a member who qualifies as a financial expert as required by the New York Stock Exchange listing requirements; and

(h)    That Goldstein and Bulldog have accepted "greenmail" payments from the companies they target.  For example, in 2006, Karpus, an ally of Bulldog, made a proposal to terminate the investment management agreement between J. & W. Seligman & Co. Incorporated (the "Manager") and Seligman Select Municipal Fund, Inc.  Bulldog and Karpus abruptly ended their proxy contest and sold their shares to the Chairman of the Seligman Fund, who also

owned a substantial percentage of the Manager, at a considerable premium above the market price.  In connection with the buy-out of their stakes, Bulldog and Karpus agreed not to conduct a proxy contest at the Seligman Fund for 25 years.

48.     Defendants' Bulldog 2007 Proxy is further materially misleading and violates Section 14(a) of the Exchange act and Rules 14a-3, 14a-4 and 14a-9 by failing to list Timothy Brog, one of its nominees, as a participant in the solicitation.

49.     In addition, Defendants' Bulldog 2007 Proxy is materially misleading and violates Section 14(a) of the Exchange act and Rules 14a-3, 14a-4 and 14a-9 by failing to disclose whether each of Bulldog's nominees has consented to being named in the proxy statement as a nominee and to serve as a director if elected.  If all of Bulldog's nominees have not consented to being named in the proxy statement and to serve if elected, Bulldog has violated the *bona fide* nominee rule of 14a-4(d) and is soliciting proxies for nominees without their consent.  Thus, Defendants are unwilling to assure shareholders that the director nominees they are proposing will actually serve.

50.     The Bulldog 2007 Proxy's "Proposal 3: A Proposal to Dismantle the Company's Pill" is also materially false and misleading.  That proposal states that "Gyrodyne has a poison pill whose purpose is to prevent shareholders from accepting a premium offer for their shares unless the board approves it."  In fact, the Company maintains a Shareholder Rights Plan to protect the Company and its shareholders from unfair and coercive takeover tactics, such as partial or two-tier tender offers, creeping acquisitions and other tactics that the board of directors believes are unfair to the Company's shareholders. The Shareholder Rights Plan is not intended to prevent a takeover of the Company, nor does it change or diminish the fiduciary obligations of the Company's board of directors.

51.     Defendants' inadequate and misleading description of their proposal to

dismantle Gyrodyne's shareholder rights plan is especially egregious and all the more misleading because, in violation of SEC Rules, Defendants conceal the fact that on April 17, 2006, Bulldog unsuccessfully made an inadequate offer to acquire all of Gyrodyne's outstanding shares at $48.00 per share, less than the highest trading price on that day. Plainly shareholders would consider it material that the very persons advocating dismantling Gyrodyne's protections against inadequate takeover offers had themselves unsuccessfully made a low-ball offer for all of Gyrodyne's stock.

52.    The Bulldog 2007 Proxy Statement fails to conform to numerous requirements set forth in Schedule 14A promulgated under Rule 14a-3. The requirements of Schedule 14A were promulgated to ensure that, when evaluating proxies, shareholders were presented with sufficient information regarding the persons making the solicitation, their history, motives and future plans for the company in order to make an informed decision. Because it is contrary to Defendants' interests that shareholders make informed decisions, the Bulldog 2007 Proxy Statement fails to conform to the Schedule 14A requirements.

53.    Moreover, by failing to disclose the identities of all of the participants in their proxy solicitation, describe their current holdings of Gyrodyne stock and those of their affiliates or to disclose their purchases and sales of Gyrodyne stock, as required by Item 5 of Schedule 14A, Defendants have deprived Gyrodyne's shareholders of legally mandated and plainly material information about the financial and other interests in Gyrodyne of the persons soliciting their proxies.

54.    The form of proxy attached to the Bulldog 2007 Proxy is also materially false and misleading in that it fails to meet the requirements of Rule 14a-4. The Bulldog 2007 Proxy misinforms the Company's shareholders of the options they have when voting by proxy. Specifically, the form of proxy fails to identify in bold face type on whose behalf the solicitation

-20-

is made; fails to identify clearly and impartially each matter to be acted upon; and fails to provide the required instructions and explanations concerning the election of directors.

55.     Defendants made the misstatements and omissions in the Bulldog 2007 Proxy Statement detailed in Paragraphs 45 through 53 with knowledge that they were violating Section 14(a) and Rules 14a-3, 14a-4 and 14a-9.   Defendants were put on notice that their form of proxy was false and misleading and violated the SEC's requirements by virtue of the comment letter it received from the SEC in connection with its 2006 Proxy.  Defendants' contempt for the regulations promulgated by Congress and SEC to protect shareholders and to give the investing public the information necessary to make an informed investment is underlined by their December 4, 2006 letter to the SEC, refusing to amend their 2006 Proxy Statement to conform to the requirements of the Exchange Act and the rules promulgated thereunder.  Upon information and belief, Defendants once again disregarded the SEC Staff comments in 2007 and filed the definitive Bulldog 2007 Proxy Statement with the SEC without receiving approval from the SEC regarding the Bulldog Preliminary Proxy in violation of Rule 14a-6.

56.     The Bulldog Letter also violates Section 14(a) and Rule 14a-9 promulgated thereunder.   In this regard, the Bulldog Letter improperly impugns the skills, integrity and character of Gyrodyne's Management and Board of Directors, falsely claiming that they have squandered Gyrodyne's assets, mismanaged Gyrodyne and taken for themselves excessive compensation.

57.     The Bulldog Letter falsely claims that "millions of dollars have been squandered due to mismanagement" asserting that Gyrodyne's management waited two years to default one of its tenants that had stopped paying rent after only four months of tenancy, and failed to prosecute an eminent domain claim against the State of New York diligently.  Contrary to Bulldog's claims, however, the tenant continued to make partial payments until early 2007.

Gyrodyne filed a notice of default one month after the tenant stopped paying rent and evicted the tenant within three months. Similarly, despite Bulldog's claims, Gyrodyne has diligently litigated its claims against the State of New York and is now awaiting a trial date.

58. The Bulldog Letter falsely claims that Gyrodyne's management and the Board lack the requisite expertise to manage the Company's real estate holdings, and as a result "cost shareholders $15 million" because "management failed to meet a capital call on its interest in a Florida land partnership" and "let an offer of at least $100 million for [Gyrodyne's Long Island] property slip away." These statements too are demonstrably false. Indeed, Gyrodyne made a business decision not to invest additional resources in the Florida project because it was not profitable and had not provided any cash return to Gyrodyne since 1991, and Gyrodyne has never received a bona fide $100 million offer for its Long Island property much less let one "slip away".

59. Bulldog's claim that Gyrodyne's management and Board lack any real estate experience is also plainly false. To the contrary, two of Gyrodyne's outside directors, Nader Salour and Ronald Macklin have significant real estate experience and Gyrodyne's CEO has been involved in real estate lending and investment for many years, both at Gyrodyne and during his thirty-five year career in commercial banking and in property management since 1996.

60. The Bulldog Letter also makes the scurrilous accusation that Gyrodyne's management has "been getting paid just for showing up" and that Gyrodyne's CEO does no work, and spends his day "endorsing a few rent checks and reviewing interest statements from the bank." Bulldog has no basis for these false claims, in blatant violation of Rule 14a-9.

61. The Bulldog Letter further falsely claims that, in 2002, Gyrodyne sold "a valuable parcel of property for a lowball price of $5.4 million." In fact, the parcel was sold for a price that exceeded a market valuation conducted in January 2002 by a nationally recognized

firm.

62.     The Bulldog Letter also falsely suggests that management misrepresented that a claim by DPMG, Inc. d/b/a Landmark National ("Landmark"), relating to the company's eminent domain claim against the State of New York, was without merit because the Company later entered into a consulting agreement with Landmark.  The Bulldog Letter mischaracterizes the consulting agreement as a "settlement" of a claim by Landmark to certain condemnation proceeds arising out of the eminent domain claim.  In fact, however, the agreement between the company and Landmark included recognition of services provided by Landmark between October 2004 and October 2006, provided for ongoing services and negated Landmark's previous claim to 10 percent of the eventual proceeds of the eminent domain claim against the State of New York.

63.     The Bulldog Letter also falsely claims that Gyrodyne's stock trades for 25 percent of its "intrinsic value" of $200 per share because "management is not credible".  The Bulldog letter falsely claims that Gyrodyne's management has valued the Company's assets at $200 per share; however, only by distorting managements valuations, failing to consider taxes, transaction costs, the time necessary to liquidate real estate assets and other significant expenses, does Bulldog manufacture this inflated "intrinsic value."  The Bulldog letter, moreover, fails to disclose that Bulldog itself does not value Gyrodyne at $200 per share, having offered to acquire Gyrodyne in 2006 for $48 per share.

64.     Finally, the Bulldog Letter further misrepresents Bulldog's history of violating the federal securities laws claiming that "the SEC has [n]ever taken any action against us for violating the securities laws" when, in fact, as described in paragraph 27 above, the SEC informed Bulldog in writing that the Bulldog 2006 Proxy had been distributed to shareholders in violation of the Exchange Act proxy rules.

65.     The misstatements and omissions in the Bulldog 2007 Proxy Statement and the Bulldog Letter detailed in Paragraphs 45 through 53 and paragraphs 56 through 63 prevent Gyrodyne shareholders from discovering, among other things, that Goldstein, Dakos and Brog committed securities law violations in soliciting Gyrodyne shareholders last year (and again this year); that, indeed, the Defendants Goldstein, Dakos and Bulldog have a history of flouting SEC Rules and federal and state laws put in place to protect shareholders; that Goldstein, Dakos and Bulldog are motivated solely by their own interests and greed and have on numerous occasions taken stakes in other companies or sought representation on company boards in order to enrich themselves at the expense of the targeted company and its other shareholders; that Defendants' proposal to dismantle Gyrodyne's Shareholder Rights Plan would open the door to a coercive inadequate takeover of Gyrodyne in which they hope to reap a short-term profit at the expense of Gyrodyne's and its shareholders' long-term interests; and that, upon information and belief, Defendants filed the definitive Bulldog 2007 Proxy Statement with the SEC without receiving approval from the SEC regarding the Bulldog Preliminary Proxy in violation of Rule 14a-6.

66.     The omitted information is plainly material to shareholders who have a right to know that Bulldog will enrich itself at their expense and without regard to applicable laws, rules or regulations. If Defendants are permitted to solicit proxies, absent disclosure of these facts, Gyrodyne's shareholders will cast their votes without knowledge of Goldstein's, Dakos' and Bulldog's sordid background and self-interested motives, and the shareholder protections implemented by the SEC pursuant to the Exchange Act will be eviscerated. Accordingly, unless the Court enjoins Defendants from soliciting proxies pursuant to their incomplete, false and misleading proxy statement, Gyrodyne and its shareholders will be irreparably harmed and Defendants will effectively deprive Gyrodyne shareholders of their right

-24-

to cast an informed vote.  Monetary damages would not adequately compensate Gyrodyne or its shareholders for the harm done to Gyrodyne and its shareholders if Defendants' false and misleading proxy solicitation is not enjoined, and thereby corrupts the election of directors.

## COUNT I

### Violation of Section 14(a) of the Exchange Act and Rule 14a-9 against All Defendants

67.     Gyrodyne repeats and realleges paragraphs 1 through 66 as if fully set forth herein.

68.     Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder prohibit the misrepresentation or omission of material facts in "any proxy statement, form of proxy, notice of meeting or other communication, written or oral…with respect to the solicitation of a proxy."

69.     The Bulldog 2007 Proxy, the Bulldog Letter and statements with respect thereto constitute solicitations within the meaning of Section 14(a) of the Exchange Act and Rule 14a-9.

70.     Defendants disseminated the Bulldog 2007 Proxy Statement and the Bulldog Letter, filed pursuant to Section 14(a), throughout the United States by use of the mails and/or means of instrumentalities of interstate commerce, including, but not limited to filings with the SEC.

71.     The Bulldog 2007 Proxy Statement and the Bulldog Letter, filed pursuant to Section 14(a), is materially misleading and in violation of the federal securities law for, *inter alia*, failing to disclose (a) that Bulldog nominees Goldstein, Dakos and Brog violated federal securities laws in connection with last year's solicitation of proxies from Gyrodyne shareholders; (b) the Massachusetts Securities Division found that Bulldog nominees Goldstein and Dakos

-25-

committed an illegal offer of securities and ordered them to cease-and-desist and pay a $25,000 fine; and (c) Defendants' histories as corporate raiders and green mailers.

72.    At the time that Defendants filed the Bulldog 2007 Proxy Statement and the Bulldog Letter, pursuant to Section 14(a), Defendants knew that the Bulldog 2007 Proxy Statement was false or misleading or recklessly disregarded or were negligent in failing to investigate and discover that the statements were false and misleading.

73.    The Bulldog 2007 Proxy Statement and the Bulldog Letter violates Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

74.    As a result of Defendants' continuing violations of Section 14(a) and Rule 14a-9, the Company, its shareholders and the investing public have been, are being and will continue to be materially misled unless this Court grants Gyrodyne the necessary and appropriate relief. Defendants' continued material misstatements and omissions are negatively impacting the ability of Gyrodyne's other shareholders to make fully informed decisions with respect to how to vote their Gyrodyne shares.

75.    Gyrodyne has no adequate remedy at law.

## COUNT II

### Violation of Section 14(a) of the Exchange Act and Rule 14a-3 against All Defendants

76.    Gyrodyne repeats and realleges paragraphs 1 through 75 as if fully set forth herein.

77.    Section 14(a) of the Exchange Act and Rule 14a-3 promulgated thereunder prohibit proxy solicitations unless each person solicited is concurrently furnished with or has previously been furnished with a publicly-filed or definitive written proxy statement containing the information specified in Schedule 14A.

78.     The Bulldog 2007 Proxy and statements with respect thereto constitute solicitations within the meaning of Section 14(a) of the Exchange Act and Rule 14a-3.

79.     The Bulldog 2007 Proxy Statement, filed pursuant to Section 14(a), violates Rule 14a-3 because, as detailed in Paragraphs 45 through 53, it fails to conform to the numerous requirements outlined in Schedule 14A, which lists the information required in a proxy statement.

80.     As a result of Defendants' continuing violations of Section 14(a) and Rule 14a-3, the Company, its shareholders and the investing public have been, are being and will continue to be materially misled unless this Court grants Gyrodyne the necessary and appropriate relief. Defendants' continued material misstatements and omissions are negatively impacting the ability of Gyrodyne's other shareholders to make fully informed decisions with respect to how to vote their Gyrodyne shares.

81.     Gyrodyne has no adequate remedy at law.

## RELIEF

WHEREFORE, Gyrodyne respectfully requests that this Court enter judgment in Gyrodyne's favor and against Defendants, and grant Gyrodyne the following relief:

(a)     An injunction temporarily, preliminarily and permanently enjoining Defendants from further violations of the Exchange Act;

(b)     An injunction temporarily, preliminarily and permanently enjoining Defendants from soliciting proxies pursuant to the Bulldog 2007 Proxy and the Bulldog Letter and enjoining them from voting any proxies obtained through their false and misleading proxy solicitation at Gyrodyne's upcoming annual meeting;

(c)     An order requiring Defendants to make corrective disclosures rectifying

their material violations of the Exchange Act;

       (d)    An order enjoining Defendants from representing to shareholders that the Stockholder Proposal is valid or soliciting proxies and shareholder support on the basis of the Stockholder Proposal;

       (e)    Attorneys' fees and costs; and

       (f)    Such other and further relief as the Court deems just.


Dated:     November 21, 2007              Respectfully Submitted,



By:_____

*Attorneys for Plaintiff Gyrodyne Company of America, Inc.*

Martin L. Seidel (MS-9459)
martin.seidel@cwt.com
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Tel: (212) 504-6000
Fax: (212) 504-6666

-28-